# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

JAY HOTRUM,

    Plaintiff,

v.

EDGEWATER GAMING, LLC,

    Defendant.

Case No. 2:15-cv-00775-LDG (GWF)

**ORDER**

In his complaint, plaintiff Jay Hotrum alleges that on November 2, 2013, he was in the Edgewater Hotel Casino when security personnel prevented him from leaving, then took him down to the floor, placed him in handcuffs, and detained him. He seeks damages against defendant Edgewater Gaming, LLC, the owner of the hotel.

Edgewater Gaming removed this action, asserting that this Court has diversity jurisdiction as the parties are citizens of different states and the amount in controversy exceeds $75,000. Hotrum moves to remand (#8), which Edgewater Gaming opposes (#14). The Court will deny the motion.

Edgewater Gaming moves for summary judgment (#28) on all claims. Hotrum responded (#30), conceding that he is abandoning most of his claims but that issues of

material fact remain whether the security personnel used excessive force in detaining him. The Court will grant Edgewater Gaming's motion.

<u>Motion to Remand</u>

This Court must first rule on Hotrum's motion to remand and determine whether this Court has subject matter jurisdiction over this action. *McCabe v. Gen. Foods Corp.,* 811 F.2d 1336, 1339 (9th Cir. 1987).

Removal jurisdiction under 28 U.S.C. §1441(a) gives federal district courts jurisdiction over "any civil action brought in a State court of which the district courts of the United States have original jurisdiction." 28 U.S.C. §1441. Federal district courts have original jurisdiction over civil actions in diversity cases "where the matter in controversy exceeds the sum or value of $75,000" and where the matter is between "citizens of different states." 28 U.S.C. § 1332(a). "Section 1332 requires complete diversity of citizenship; each of the plaintiffs must be a citizen of a different state than each of the defendants." *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1067 (9th Cir. 2001). "[R]emoval statutes are construed restrictively, and any doubts about removability are resolved in favor of remanding the case to state court." *McCaa v. Massachusetts Mut. Life Ins. Co.*, 330 F.Supp.2d 1143, 1146 (D. Nev. 2004). A removing party always has the burden of establishing that removal is proper. *See Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir.1992). Notwithstanding removal, a plaintiff may move to remand the removed action to state court on the ground that the federal court lacks subject matter jurisdiction. 28 U.S.C. § 1447(c).

Hotrum does not dispute that he and Edgewater Gaming are citizens of different states.

Hotrum disputes whether Edgewater Gaming has sufficiently established that the amount in controversy exceeds $75,000. He argues that his complaint "seeks damages in excess of $10,000, and that Edgewater Gaming's petition for removal "baldly asserts" that

2

his claim for punitive damages exceeds $75,000.  He suggests that this is "a claim without any measure of substantiation," and that Edgewater Gaming did not outline, in its petition, the underlying value of his damages.  Thus, he concludes, Edgewater Gaming did not meet its burden of showing damages would exceed $75,000.

The Court disagrees.  In its petition, Edgewater Gaming expressly noted that Hotrum alleged injuries resulting in a permanent partial disability and that he prayed for damages in excess of $10,000 for past medical care and treatment, and in excess of $10,000 for future medical care and treatment, and in excess of $10,000 for past and future pain, suffering, anxiety, and general damages, and in excess of $10,000 for past loss of income and earning capacity, and in excess of $10,000 for future loss of income and earning capacity.  Edgewater Gaming further noted Hotrum prayed for an unstated sum for attorneys' fees and costs of suit.  Finally, Edgewater Gaming noted Hotrum's request for punitive or exemplary damages in excess of $10,000.  As Edgewater Gaming noted in its opposition, it specifically pointed out, in its petition for removal, that Hotrum had expressly prayed for damages in excess of $60,000 in his complaint.

In contrast to the removing party in *Gaus*, Edgewater Gaming did not "simply allege[] that 'the matter in current controversy exceeds the sum of'" $75,000.  980 F.2d at 557.  Rather, Edgewater Gaming pointed out that Hotrum had six separate prayers for damages in excess of $10,000 (for a total in excess of $60,000), including damages for future medical costs and lost income, and that in light of the allegations of Hotrum's complaint, and his request for punitive damages, it was likely that Hotrum would ask a jury to award him damages in excess of $75,000.  Edgewater Gaming met its burden of identifying the allegations of Hotrum's complaint that would support a determination that he was seeking damages in excess of $75,000.  Accordingly, the Court denies Hotrum's motion to remand.

3

Motion for Summary Judgment

In considering a motion for summary judgment, the court performs "the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *United States v. Arango*, 670 F.3d 988, 992 (9th Cir. 2012). To succeed on a motion for summary judgment, the moving party must show (1) the lack of a genuine issue of any material fact, and (2) that the court may grant judgment as a matter of law. Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Arango*, 670 F.3d at 992.

A material fact is one required to prove a basic element of a claim. *Anderson,* 477 U.S. at 248. The failure to show a fact essential to one element, however, "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. Additionally, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 638 (9th Cir. 2012) (quoting *Anderson*, 477 U.S. at 252).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.*, at 323. As such, when the non-moving party bears the initial burden of proving, at trial, the claim or defense that the motion for summary judgment places in issue, the

4

moving party can meet its initial burden on summary judgment "by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." *Id.,* at 325.  Conversely, when the burden of proof at trial rests on the party moving for summary judgment, then in moving for summary judgment the party must establish each element of its case.

Once the moving party meets its initial burden on summary judgment, the non-moving party must submit facts showing a genuine issue of material fact.  Fed. R. Civ. Pro. 56(e); *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  As summary judgment allows a court "to isolate and dispose of factually unsupported claims or defenses," *Celotex*, 477 U.S. at 323-24, the court construes the evidence before it "in the light most favorable to the opposing party." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).  The allegations or denials of a pleading, however, will not defeat a well-founded motion.  Fed. R. Civ. Pro. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  That is, the opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" *Estate of Tucker v. Interscope Records*, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

Background

In his complaint, Hotrum alleged that, on November 2, 2013, he was a patron at the Edgewater Hotel Casino when security personnel informed him that there had been an incident on the River Walk, and that he and other guests needed to remain in place while the incident was investigated.  He further alleged the security personnel blocked the exits, preventing him and other patrons from leaving.  After thirty minutes, he informed the security personnel that he needed to leave in five minutes.  After five minutes had passed,

he got up to leave and "without warning or provocation, [Edgewater Gaming's] security personnel took down [Hotrum] to the floor and placed him in handcuffs."

Hotrum further alleged that, while detained, he informed the security personnel that the handcuffs were injuring his wrists, and asked that they be loosened. In response, the security personnel re-tightened the handcuffs, causing further injury.

Based on these allegations, Hotrum alleged claims for assault and battery, negligent security, negligent and intentional infliction of emotional distress, negligent use of excessive force, and negligent hiring, training, supervision and retention of Edgewater Gaming's employees.

In contrast to Hotrum's complaint, the parties have presented a significantly different series of events to the Court, primarily because the events in question were recorded on video surveillance. Hotrum was involved in an incident on the River Walk. Security personnel at the Edgewater Hotel Casino received a call from another casino seeking to locate the individual who had been involved in the River Walk incident, and provided a description matching Hotrum. At about 3:25 a.m., the Edgewater Casino Hotel security personnel began video surveillance of Hotrum while he was seated at a bar with video gaming machines.

The first interaction between security personnel and Hotrum occurred just before 3:35 a.m., as Hotrum began walking toward the casino's entrance/exit doors. A short distance before Hotrum would have reached the doors, a security person approached and stopped him. Within a minute, security personnel directed Hotrum to a chair several feet away, and he complied. (Contrary to his complaint alleging other patrons were also detained, security personnel allowed an individual accompanying Hotrum to leave.) During this time, a number of additional security personnel had arrived and were standing in varying degrees of proximity to Hotrum. Hotrum concedes that the security personnel had reasonable cause to stop and detain him.

6

Contrary to the allegations of the complaint, only one minute after sitting down, (and just two minutes after first being detained), Hotrum suddenly left his chair and began running toward the exit doors. Hotrum did not reach the doors before he was physically apprehended by two security personnel. Contrary to the allegations of the complaint, the security personnel did not take him to the ground. Rather, they turned him away from the exit, moved him (while upright) a short distance toward a waist-high cart near a wall, over which they bent him face-forward while bringing his arms behind him. With a third security person, they handcuffed Hotrum, and within about 15 seconds from first touching Hotrum, he was again standing upright. For a brief period, the third security person continued to adjust the handcuffs, and then the security personnel began walking Hotrum to a holding cell.

Within a minute of entering the holding cell, a security person checked the handcuffs. Hotrum asserts, and the court accepts as accurate for purposes of this motion, that the security person determined the handcuffs were so tight that he could not get his pinky finger between the cuffs and Hotrum's wrists. The security person then loosened the handcuffs.

On several occasions over the following hour, Hotrum complained that the handcuffs were too tight and that his arms were hurting. Several times, the security personnel responded by informing Hotrum that the handcuffs had been loosened as much as possible. Several times, a security person physically checked the handcuffs and then informed Hotrum that they were as loose as possible, including informing Hotrum that the security person had fit his thumb in the cuffs. On one occasion, two security persons removed the handcuffs entirely and then re-cuffed Hotrum. Following that occasion, Hotrum complained that the cuffs were tighter than before, that his arms hurt worse, and that he shouldn't have asked to have the cuffs adjusted. Hotrum also complained of an injury to his knee, which he attributed to the incident on the River Walk.

Hotrum concedes that, based on this evidence, he cannot maintain his claims for intentional or negligent infliction of emotional distress, and further concedes he cannot maintain his claims for negligent hiring, training, and supervision.  Hotrum argues, however, that material issues of fact remain whether the security personnel used excessive force either during the initial 15 seconds period in which they physically stopped and handcuffed him, or in the following 15 seconds in which the third security officer continued to adjust the handcuffs.

Analysis

In opposing Edgewater Gaming's motion for summary judgment, Hotrum asserts that the following facts raise a triable issue of fact whether the security personnel used excessive force in detaining him:

(1) because it took three men to secure Hotrum "even after he had succumbed to detention at the hands of Edgewater,"

(2) because one of the security persons "manipulated the cuffs after they were already secured and appeared to use his strength to tighten the cuffs on Mr. Hotrum,"

(3) because "the cuffs had to be loosened in the holding room because they were too tight," and

(4) because Hotrum had not shown or expressed evidence of pain in his wrist before being restrained by the security personnel.

None of these assertions, either standing alone or considered cumulatively, raises a triable issue of material fact whether the security personnel used excessive force in detaining Hotrum.

Hotrum argues that the three security persons apprehended him after "he changed his mind about fleeing."  As Hotrum appears to concede, the video surveillance indicates that he was attempting to flee.  The video also shows that he changed his running stride

just prior to the first security person reaching him, though the video does not indicate the reason for the change in stride. Hotrum's reason for changing his stride is irrelevant. Rather, the relevant inquiry is whether the security persons' use of physical force in response to these events (a detainee attempting to flee, who changes his stride immediately prior to physical apprehension) was reasonable. Nothing on the video tape suggests the use of force was not reasonable in light of the circumstances that Hotrum created.

Hotrum argues that the third security person continued to manipulate the handcuffs after they had already been applied. The argument rests on the premise that, prior to the additional manipulation, no further manipulation of the handcuffs was required. Hotrum has not offered any evidence to support this theory, and the video surveillance does not offer any evidence supporting an inference that the third security person was engaging in an unnecessary manipulation of the handcuffs.

Hotrum further argues that the third security person used his strength to tighten the handcuffs. Hotrum has not identified any specific movement by the third security person, nor can the Court identify any movement, that would support an inference that the security person used his strength to tighten the handcuffs.

Hotrum's remaining argument is that the handcuffs were tightened to the point of breaking his wrist bone. In support of this argument, he asserts that the video (1) does not show him expressing any evidence of pain in his wrist prior to being placed in handcuffs, (2) that within a minute of entering the holding cell (and about two minutes after the handcuffs were first applied), a security person checked the tightness of the handcuffs, determined they were too tight and loosened them, and (3) one month later, a doctor determined that the bones in the wrist had been broken. While the medical evidence submitted by Hotrum indicates a determination of a broken bone in the wrist, that evidence does not establish that the bone was broken by the tightening of the handcuffs. Rather,

9

and at most, it establishes only that Hotrum reported to the doctor that he had been handcuffed a month prior. Hotrum did not report to the doctor that, prior to being handcuffed, he had been involved in an incident in which he had suffered a fall to the ground. Accordingly, the medical evidence establishes only that Hotrum had a broken bone in his wrist, which Hotrum attributed to being in handcuffs. Hotrum argues that "a significant amount of force is required to tighten handcuffs to the point that displacement and broken bones manifest in an individual's wrist."

Hotrum's argument is, ultimately, self-defeating. If the absence of an injury is to be inferred from the absence of evidence of pain when it would otherwise be displayed, such absence of evidence must also be considered for the period both during and immediately after the handcuffs were applied. The handcuffs were applied within 15 seconds of the Hotrum's initial physical apprehension, and further manipulated in the following 15 seconds. Hotrum does not direct the Court's attention to any evidence on the video surveillance suggesting any expression of pain in his wrist, much less the expression of pain commensurate with the breaking of a bone, while he was being handcuffed.

Neither does Hotrum direct this Court's attention to any expression of pain in his wrist while he was being walked to the holding cell. Nor does Hotrum direct this Court's attention to any expression of pain in his wrist while the security person was checking the handcuffs by unsuccessfully attempting to get his pinky finger between cuff and wrist. Rather, the only evidence that the handcuffs were too tight (regardless of whether the handcuffs were causing pain) was not a statement or action by Hotrum. Rather, the evidence is the recorded statement of the security person that he couldn't get his pinky in, and his subsequent loosening of the handcuffs.

The evidence submitted to the Court establishes that Hotrum's first indication of any pain did not occur until nearly two minutes after the cuffs had been loosened, and was not made in connection with his wrists. Rather, after acknowledging an injury to his knee

10

during the incident on the River Walk, and while in the process of sitting on the bench, Hotrum exclaimed, in a voice indicating a response to pain, "Ow, my knee hurts."

Hotrum did not utter his first verbal indication that his arms hurt until 10 seconds after this, when he stated, "I'm okay with, I'm okay with whatever you guys are doing 'cause I don't know why your doing it and I don't know why I'm here but my arms hurt right now and I don't know why I'm here. Why am I here, dude? Who's in charge. Can I please speak to who's in charge." This statement of pain was not in response to any application of force to Hotrum's wrist. While Hotrum notes that he continued to express pain over the next hour, and assuming he was expressing the pain of a broken bone, nothing in his expressions permits any inference as to when the injury occurred.

Hotrum's further argument that a significant amount of force would be required to tighten a handcuff to the point of breaking a wrist bone only serves to further weaken his theory. Accepting that a significant force would be required to break his wrist bone by the tightening of handcuffs, Hotrum does not offer any explanation how handcuffs could be tightened with sufficient force to break a bone but without causing a contemporaneous expression of pain.

Further, Hotrum has not raised a triable issue of fact even if the Court assumes that his wrist was broken during the 30 seconds in which he was physically apprehended and handcuffed by defendant's security personnel. A finding that a use of force resulted in an injury does not establish that the force used was excessive. When considered in context, a reasonable use of force can result in an injury. The context of Hotrum's apprehension and handcuffing was recorded by video surveillance, and that recording lacks any indication that the force used by the security personnel was excessive to the circumstances, even if that use of force resulted in a fractured wrist bone. Nothing in the video suggests that the security personnel used a level of force beyond that necessary to restrain and handcuff an individual who just attempted to flee from them.

Accordingly, for good cause shown,

THE COURT **ORDERS** that Jay Hotrum's Motion to Remand (#8) is DENIED;

THE COURT FURTHER **ORDERS** that Edgewater Gaming, LLC's Motion for Summary Judgment (#28) is GRANTED.  The Clerk of the Court shall enter judgment in favor of defendant Edgewater Gaming and against plaintiff Jay Hotrum.  Plaintiff Jay Hotrum shall take nothing on his claims; defendant Edgewater Gaming is awarded its costs and fees against plaintiff Jay Hotrum.

DATED this __31__ day of March, 2016.

Lloyd D. George
United States District Judge